

Villanova University School of Law

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-24-2006

# USA v. Leahy

Precedential or Non-Precedential: Precedential

Docket No. 03-4490

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Leahy" (2006). *2006 Decisions*. Paper 1336.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1336

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 03-4490/4542/4560

———

UNITED STATES OF AMERICA

v.

PAUL J. LEAHY

Appellant in No. 03-4490

———

UNITED STATES OF AMERICA

v.

TIMOTHY SMITH

Appellant in No. 03-4542

———

UNITED STATES OF AMERICA

v.

DANTONE, INC.

Appellant in No. 03-4560

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 01-cr-00260-2)
District Judge: Honorable J. Curtis Joyner

———

Argued June 8, 2005

Before: FUENTES, VAN ANTWERPEN, and BECKER,
Circuit Judges.

(Filed: March 24, 2006)

———

Robert E. Welsh, Jr. (Argued)
Lisa A. Mathewson
Welsh & Recker, P.C.
2000 Market Street, Suite 2903
Philadelphia, PA 19103

ATTORNEYS FOR APPELLANT PAUL J. LEAHY

Jeffrey M. Miller (Argued)
Nasuti & Miller
Public Ledger Building, Suite 1064
150 South Independence Mall West
Philadelphia, PA 19106

ATTORNEY FOR APPELLANT TIMOTHY SMITH

Ian M. Comisky (Argued)
Matthew D. Lee
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103

ATTORNEYS FOR APPELLANT DANTONE, INC.

Patrick L. Meehan
United States Attorney
Laurie Magid
Deputy United States Attorney for Policy and Appeals
Robert A. Zauzmer (Argued)
Assistant United States Attorney, Senior Appellate Counsel
Mary E. Crawley (Argued)
Assistant United States Attorney
Office of the United States Attorney
615 Chestnut Street
Philadelphia, PA 19106

2

ATTORNEYS FOR APPELLEE UNITED STATES OF AMERICA

———

## OPINION OF THE COURT

———

FUENTES, <u>Circuit Judge</u>.

## I. Introduction

For a period of almost three years, the Defendants, Dantone, Inc., and its two senior managers Paul Leahy and Timothy Smith, were retained by several banks to auction repossessed automobiles at the highest price and reimburse the proceeds, minus fees and expenses, to the banks. With respect to at least 311 automobiles, however, the Defendants did not auction the cars to the highest bidder and remit the proceeds to the banks as promised. Rather, they kept those cars for their own inventories, resold them at higher prices, falsely misrepresented to the banks that they had been auctioned for less, and pocketed the difference between the false and actual prices. A jury found Smith, Leahy, and Dantone guilty of engaging in, and aiding and abetting, bank fraud in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 2.

This matter presents several issues on appeal. First, we address several contentions that the District Court erroneously instructed the jury as to the Government's burden under the bank fraud statute. Second, we consider whether there was sufficient

3

evidence to sustain the Defendants' convictions.  Third and finally, we address the scope of the federal bank fraud statute, 18 U.S.C. § 1344, and clarify the intent and loss elements required to support a conviction under the statute.[1]

Because we ultimately reject the Defendants' arguments with respect to the scope of the bank fraud statute, the District Court's jury instructions, and the sufficiency of the evidence, we will affirm their judgments of conviction.  We also decide that, to the extent that the Defendants contend that the imposition of their sentences pursuant to the U.S. Sentencing Guidelines (the "Guidelines" or "U.S.S.G") are in error after Booker, such issues are best determined by the District Court in the first instance. See United States v. Davis, 407 F.3d 162 (3d Cir. 2005).

Accordingly, we will vacate the Defendants' sentences and remand for further proceedings consistent with this opinion. Because the forfeiture and restitution orders are inextricably intertwined with the District Court's loss findings under the Guidelines, we will vacate and remand those orders as well.

## II.  Background

---

[1]The fourth issue in this case, the applicability of United States v. Booker, 125 S.Ct. 738 (2005), to orders of forfeiture and restitution is addressed in a separate opinion.  See United States v. Leahy, __ F.3d __, 2006 U.S. App. LEXIS 3576 (3d Cir. Feb. 15, 2006).  We apply our holding in Leahy in Part V.

## A. Facts

On May 15, 2001, a federal grand jury sitting in the Eastern District of Pennsylvania returned a ten count indictment charging Defendants Smith, Leahy, and Dantone with bank fraud, in violation of 18 U.S.C. § 1344, and aiding and abetting, in violation of 18 U.S.C. § 2 (the "Indictment"). Dantone is a privately held corporation which owns and operates a public automobile auction in Conshohocken, Pennsylvania, known as Carriage Trade Auto Auction ("Carriage Trade"). Dantone's sole shareholder and president was Dominic Conicelli, Sr. During all times relevant to the Indictment, Smith was the general manager of Carriage Trade, while Leahy was the assistant manager or operations manager.

The Indictment alleged that between approximately 1993 and 1996, Dantone entered into agreements with ten financial institutions (collectively, "the banks") to auction automobiles and remit the full proceeds of the actual sales, minus auction fees and expenses.[2] Of the ten banks at issue in this case, nine consigned cars that had been repossessed following the owners' default on a loan obligation, while the tenth, Continental Bank,

---

[2]The ten banks at issue in this matter are: Meridian Bank, Continental Bank, Trust Company of New Jersey, National Bank of Boyertown, National Penn Bank, Midlantic National Bank, Bryn Mawr Trust Company, the Police and Fire Credit Union, Mellon Bank, and the DPL Federal Credit Union. The deposits of each of these banks were insured either by the Federal Deposit Insurance Corporation or the National Credit Union Administration.

consigned repossessed cars as well as cars that had been returned at the expiration of lease agreements.

Per their agreements, the banks consigned the automobiles to Carriage Trade to be auctioned to the highest bidder. Nine of the ten banks established a minimum or floor price for each car; if the highest auction price fell below the minimum, the car could not be sold without the bank's consent. The banks typically would set the minimum price based on the condition of the car and in consultation with the auction's employees. The tenth bank, rather than setting minimum bids, informed Carriage Trade personnel of the amounts owed by the bank's customers on the defaulted car loans. Evidence at trial indicated that it was routine for the banks to face a deficiency balance on the outstanding loan even after the car had been auctioned, from which it could be inferred that the amount of the minimum bid set by the banks was typically lower than the outstanding loan obligation on the car. For the most part, the cars were sold "as is." When Carriage Trade sold automobiles at auction on behalf of one of the banks, Carriage Trade would send checks representing the proceeds of the sale, a bill of sale, and documents showing the expenses incurred by the auction in selling the automobiles. If the car was one which had been repossessed by the bank, the money made from the sale of the car at auction could then be put toward satisfying the outstanding loan. The banks assumed or were told that the checks received from the Carriage Trade auction represented the highest bid,

6

minus fees and expenses.

The Indictment alleges that Dantone, Smith and Leahy defrauded the banks by not actually selling certain automobiles at an auction to the highest bidder or at the prices the Defendants represented to the banks. Instead, the Defendants diverted the cars into Carriage Trade's inventory, apparently repaired and/or reconditioned them in limited instances, and then sold them under the Carriage Trade name at a "second sale" at prices equal to or higher than the minimum established by the banks. The Defendants deceived the banks with respect to at least 311 cars, pocketing the difference between the prices they falsely represented to the banks and the real prices they obtained for the cars at the second sale. Typically, the Defendants used two methods to sell the cars for themselves. Most of the cars were sold through the Carriage Trade auction to good faith purchasers who did not know that the Defendants had misappropriated the cars for their own inventories. The Defendants also sold a smaller number of cars in a private auction to a select group of car dealers, who were invited to bid on the cars. The scheme began to unravel, however, when Edward Stigben, a co-schemer with the Defendants, was approached by the FBI regarding an on-going investigation of Carriage Trade; Stigben eventually received immunity from the Government in exchange for his testimony at trial regarding the fraudulent scheme.

A 2 1/2 week jury trial began on December 2, 2002. The

7

Government introduced the testimony of bank representatives as well as employees of Carriage Trade. The Government also introduced a ledger maintained by Leahy (the "Leahy ledger") which detailed the profits realized by Dantone as a result of the Defendants' deceptive conduct. In addition, the Government introduced, for each of the 311 cars, the two sets of documents that Carriage Trade prepared: the false bill of sale and accompanying paperwork which the Defendants sent to the bank along with a check, and the true bill of sale and accompanying paperwork that was generated when the Defendants sold the cars for their own benefit.

On December 20, 2002, the jury returned a verdict of guilty on all counts as to each Defendant.

### B. Sentencing

Thereafter, the District Court initiated sentencing proceedings against the Defendants. Because the Defendants' conduct involved a fraudulent scheme in violation of 18 U.S.C. § 1344, they were sentenced under U.S.S.G. § 2F1.1, the Guidelines provision applicable to crimes of fraud and deceit. Section 2F1.1 provides for a base offense level of six with enhancements to the offense level based on the amount of loss to the victim attributable to the fraudulent conduct. At the Defendants request, the District Court held a four hour evidentiary hearing to determine the amount of loss to the victim

banks for purposes of the Guidelines. The Defendants, relying on United States v. Dickler, 64 F.3d 818 (3d Cir. 1995), argued that the loss to the banks was zero, or in the alternative, far less than the $418,657 amount relied on by the Government. In particular, the Defendants contended that they had significantly enhanced the values of the consigned automobiles by refurbishing them and by extending certain guarantees and perks such as credit terms to purchasers under the Carriage Trade name. They argued that any such "improvements" in value to the cars should not be credited as loss to the banks for purposes of the Guidelines. At the end of the hearing, the District Court essentially adopted the Government's position, finding that the loss to the banks was $408,970, which was calculated by subtracting from the total gain to the Defendants – the $418,657 amount representing the difference between the false sales price and the actual sales price for the 311 cars – the following: (1) $5,000 for a reimbursement payment that Carriage Trade made to one of the banks (Midlantic Bank) after the bank discovered a fraudulent sale and complained to Conicelli; and (2) $4,687 in repairs and enhancements which the District Court found the Defendants made to some of the 311 cars. The loss finding of $408,970 triggered a nine-level enhancement in the offense level pursuant to U.S.S.G. § 2F1.1.

In addition, the Indictment contained a notice of forfeiture pursuant to 18 U.S.C. § 982(a)(2) in the amount of $418,657, which was alleged to be the proceeds of the scheme, i.e., the

difference between the false sales prices and the actual sales prices. During trial, the parties agreed to remove the forfeiture issue from the jury and have it decided by the District Court. On February 19, 2003, the Government filed a motion seeking entry of an order of forfeiture and money judgment. The Defendants objected, contending that the gain from their fraud was less than $418,657, based on their physical repairs to the cars as well as the other sales guarantees that were extended under the Carriage Trade name. The District Court eventually entered an order of forfeiture and money judgement in the amount of $418,657, concluding that the Government had established by a preponderance of evidence that the sum constituted proceeds that the Defendants had obtained directly or indirectly as a result of the offenses for which they were convicted.

In addition to the loss and forfeiture calculations, Smith and Leahy objected to several sentencing enhancements for their alleged role in the offense. The District Court, however, found that Smith and Leahy participated in a fraud that was committed by five or more participants, within the meaning of U.S.S.G. § 3B1.1(a); that Smith was a leader or organizer of the fraud; and that Leahy was a manger or supervisor of the fraud. Accordingly, the District Court applied a four-level enhancement to Smith's base offense level, and a three-level enhancement to Leahy's base offense level.

Smith was sentenced to a prison term of 46 months; five

years of supervised release; a fine of $10,000; a special assessment of $1,000; restitution, for which he bears joint and several liability, in the amount of the victim banks' loss, i.e., $408,970; and forfeiture, for which he is jointly and severally liable, in the amount of the Defendants' proceeds, i.e., $418,657. Leahy was sentenced to a prison term of 37 months; five years of supervised release; a fine of $5,000; and the same penalties as Smith regarding special assessment, restitution, and forfeiture. The corporate defendant Dantone received five years of probation; a fine of $800,000; and the same penalties as Leahy and Smith regarding restitution and forfeiture.[3]

\*     \*     \*

In their appeal from their judgments of conviction and sentence, the Defendants raise several arguments. First, the Defendants allege that the District Court's jury instructions were defective in several critical respects and failed properly to instruct the jury as to the requisite elements to convict under § 1344. Second, they contend that there was insufficient

---

[3]It appears that, due to a clerical error, the written judgment for the corporate Defendant Dantone contained several penalties that can only be levied against an individual. For instance, the written judgment specified that Dantone could not leave the district without permission of the probation officer, must support his or her dependents, and refrain from using drugs or excessive alcohol. The United States has indicated that it consents to the entry of an order of this Court striking these provisions. See Gov. Br. at 10 n.1. However, because we will vacate the sentences and remand for resentencing, no such order will be necessary, and the District Court may correct any such error on remand.

11

evidence to sustain a conviction of bank fraud as the Government failed to proffer any evidence that the banks suffered any loss or that the Defendants acted with the requisite intent to defraud the banks, as opposed to the banks' customers, the borrowers in whose name the cars were titled. With regard to their sentences, the Defendants contend that the District Court erred in calculating the amount of loss suffered by the banks, which was relied upon by the District Court to calculate the Defendants' sentences, including their criminal fines, as well as the amount of restitution and forfeiture. The Defendants also contend that the District Court's imposition of fines, restitution and forfeiture for conduct arising out of the same underlying facts violates the Eighth Amendment's Excessive Fines Clause, and that the District Court erred in imposing joint and several liability on the three Defendants for the orders of restitution and forfeiture. Finally, the Defendants, relying on the Supreme Court's decision in <u>Booker</u>, contend that the District Court's imposition of forfeiture and restitution violated the Sixth Amendment.[4]

We consider each argument in turn.

## III. JURY INSTRUCTIONS

The Defendants were convicted of violating the federal bank

---

[4]This Court has jurisdiction over a judgment of conviction and sentence in a criminal case pursuant to 28 U.S.C. § 1291.

fraud statute, 18 U.S.C. § 1344, which imposes criminal penalties upon:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice to
>
> (1)     defraud a financial institution; or
>
> (2)     obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises.

The Defendants argue that the District Court: (A) improperly instructed the jury on the two prongs of the bank fraud statute; (B) improperly defined a scheme or artifice to defraud; (C) failed to give Defendants' requested good faith instruction; (D) improperly gave a willful blindness instruction; (E) improperly gave an intangible rights instruction; and (F) improperly gave a co-schemers' liability instruction.

We exercise plenary review in determining "whether the jury instructions stated the proper legal standard." United States v. Coyle, 63 F.3d 1239, 1245 (3d Cir. 1995). We review the refusal to give a particular instruction or the wording of instructions for abuse of discretion. Id. Finally, "when we consider jury instructions we consider the totality of the instructions and not a

particular sentence or paragraph in isolation." Id.

### A. Bank fraud

The District Court provided a lengthy instruction to the jury regarding the elements of bank fraud. The Defendants contend that the bank fraud instruction was in error in at least two material respects under United States v. Thomas, 315 F.3d 190 (3d Cir. 2002), a case decided only days after the jury reached its verdict in this matter.[5] First, they contend that the instruction is premised upon a disjunctive reading of § 1344 in violation of Thomas. Second, the Defendants contend that the instruction with regard to § 1344's intent requirement was in error. We find both arguments to be without merit.

In Thomas, we addressed whether the "intent to defraud the bank" element of § 1344(1) was to be read as applying to § 1344(2) as well, or whether the two prongs of the bank fraud statute should be read independently of each other. We concluded that a "disjunctive reading of the two sections of § 1344 . . . gives the statute a breadth of scope that extends well beyond what Congress intended the statute to regulate." 315 F.3d at 196. Relying on our

---

[5]Although Thomas was decided after the jury reached its verdict, it is well-established that we will apply the law of the Court as it exists at the time of appeal. See Virgin Islands v. Civil, 591 F.2d 255, 258 (3d Cir. 1979) ("As a general principle, an appellate court applies the law as it exists at the time of appeal even if different than at the time of trial.").

prior decision in <u>United States v. Monostra</u>, 125 F.3d 183 (3d Cir. 1997) (suggesting, but not holding, that the two sections of § 1344 must be read conjunctively), as well as the legislative history of the bank fraud statute, we concluded that the § 1344 must be read in the conjunctive, that the intent to defraud the bank element of § 1344(1) must apply to § 1344(2) as well. <u>Thomas</u>, 315 F.3d at 196. Accordingly, "there can be no such thing as an independent violation of subsection (2). To convict at all under the bank fraud statute, there must be an intent to defraud the bank." <u>Id.</u>, 315 F.3d at 197. "The <u>sine qua non</u> of a bank fraud violation, no matter what subdivision of the statute it is pled under, is the intent to defraud the bank." <u>Id.</u>[6]

After reviewing the District Court's bank fraud instruction in this matter, we find that the instructions did not rest on an

---

[6]There is some disagreement among the circuits as to the proper reading of § 1344. For instance, the Second Circuit formally reads § 1344 in the disjunctive. <u>See</u> <u>United States v. Crisci</u>, 273 F.3d 235, 239 (2d Cir. 2001). However, as we noted in <u>Thomas</u>, to the extent that the Second Circuit implies the intent to defraud requirement of subsection (1) to cases brought under subsection (2), there is no meaningful difference in our interpretation of the statute. <u>See</u> <u>Thomas</u>, 315 F.3d at 198 n.1 (citing <u>United States v. Rodriguez</u>, 140 F.3d 163, 167 n.2 (2d Cir. 1998) (noting that deceptive pattern of conduct designed to deceive bank was required to prove case under either subsection (1) or (2))). <u>Accord</u> <u>United States v. Sprick</u>, 233 F.3d 845, 852 (5th Cir. 2000); <u>United States v. Davis</u>, 989 F.2d 244, 246-47 (7th Cir. 1993). However, it appears that the Sixth Circuit has taken a contrary view, holding that under subsection (2) of § 1344, there is no requirement that the defendant intended to defraud the bank. <u>See</u> <u>United States v. Everett</u>, 270 F.3d 986, 991 (6th Cir. 2001).

15

erroneous disjunctive reading of § 1344.  The instructions explained the two prongs of the bank fraud statute as follows:

> The bank fraud law provides that whoever knowingly executes or attempts to execute a scheme or artifice, one, *to defraud a federally chartered or insured financial institution, or two, to obtain any of the moneys, funds, credits, assets, security or other property owned by or under the control or custody of a financial institution by means of false or fraudulent pretenses, representations or promises*, shall be guilty of the crime of bank fraud.

> . . .

> Members of the jury, the first element is that the government must prove beyond a reasonable doubt that there *was a scheme or artifice to defraud a financial institution, or a scheme or artifice to obtain any of the money owned by or under the custody or control of a financial institution* by means of false or fraudulent pretenses, representations or promises.

> The phrases, scheme or artifice to defraud, and scheme or artifice to obtain money, means any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another,

16

or by which someone intends to deprive another of something of value. A scheme or artifice includes a scheme to deprive another person of tangible, as well as intangible property rights.

App. at 2131a-2332a (emphasis added). Although the District Court did no more than quote the plain language of both prongs of § 1344, the Defendants take issue with the highlighted language, which they contend permitted the jury to convict on a disjunctive reading of the statute in violation of Thomas. However, the Defendants read the quoted paragraphs in isolation, ignoring the District Court's subsequent instructions with regard to the specific intent requirement of § 1344. See Coyle, 63 F.3d at 1245 (noting that the Court will "consider the totality of the instructions and not a particular sentence or paragraph in isolation").

In particular, the District Court instructed the jury that:

The second element of bank fraud, which the government must prove beyond a reasonable doubt, is that the defendants participated in the scheme to defraud with the intent to defraud. To act with an intent to defraud means to act knowingly and with the purpose to deceive or to cheat. An intent to defraud is ordinarily accompanied by a desire or a purpose to bring about gain or benefit to oneself or some other person, or by a desire or a purpose to

17

cause some loss to some person. *The intent element of bank fraud is an intent to deceive the bank in order to obtain from it money or other property.*

App. at 2135a (emphasis added). This is in accord with the holding of Thomas, that "the sine qua non of a bank fraud violation, no matter what subdivision of the statute it is pled under, is the intent to defraud the bank." Thomas, 315 F.3d at 197.[7] In Thomas, we recognized that "[b]ank fraud may involve a scheme to take a bank's own funds, or it may involve a scheme to take funds merely

---

[7]Our dissenting colleague contends that the "intent to deceive the bank" instruction was too "isolated" from the disjunctive reading of the statute, and was not otherwise given when the jury asked the District Court to repeat the elements of bank fraud. Dis. Op. at 4. With regard to the former contention, we note that the District Court instructed the jury that the "intent to defraud" element of § 1344 was defined as "intent to deceive the bank in order to obtain from it money or other property." If anything, by clearly defining the mens rea element of § 1344 as part of the charge on intent, the District Court amplified the requirements of Thomas, rather than isolate it in the instructions, as the dissent contends. As for the dissent's latter contention, we agree that the District Court only stated that "an intent to defraud" was required. However, in this supplemental charge, the District Court clearly indicated that it was only "reinstruct[ing] on the elements of bank fraud." App. at 2160a. It was not, however, reinstructing on the definition of these elements. Id. ("If you want the additional definitions of each of these terms that are used, then you can go back out and put that on paper and ask for me to do it."). In these circumstances, we do not believe that the jury was misinformed regarding the mens rea element of § 1344, when the District Court previously clearly defined the "intent to defraud" element as the "intent to deceive the bank in order to obtain from it money or other property."

18

in a bank's custody" so long as the government established the requisite intent to defraud. 315 F.3d at 197 (emphasis added). Here, the District Court did precisely that by properly instructing the jury that guilt under § 1344 depended on a finding that the Defendants had the requisite intent to defraud the banks.[8]

The Defendants' second argument is that the District Court erroneously instructed the jury as to the intent or mens rea requirement of § 1344. In particular, the District Court, while instructing the jury that an "intent to deceive the bank in order to obtain from it money or other property" must be shown, also stated that an "[i]ntent to harm the bank is not required." App. at 2135a. Defendants contend that this was in error because conviction under § 1344 requires not only proof of an intent to defraud the bank, but also of an intent to harm the bank. In making this argument, Defendants once again rely on our decision in Thomas. However, we do not believe that this case is controlled by Thomas; rather, we believe it is controlled by our later decision in United States v.

---

[8]The dissent focuses on the fact that the District Court defined the mens rea element of § 1344 as an "intent to deceive the bank in order to obtain from it money or other property," as opposed to "an intent to defraud the bank" in the language of Thomas. Dis. Op. at 6. However, it is well-established that the "intent to defraud the bank" element of § 1344 may be defined as "an intent to deceive the bank in order to obtain from it money or other property." See United States v. Moran, 312 F.3d 480, 480 (1st Cir. 2002) (quoting United States v. Kenrick, 221 F.3d 19, 30 (1st Cir. 2000) (en banc)); see also United States v. Brandon, 298 F.3d 307, 311 (4th Cir. 2002); United States v. Lamarre, 248 F.3d 642, 649 (7th Cir. 2001); United States v. Hanson, 161 F.3d 896, 900 (5th Cir. 1998).

19

<u>Khorozian</u>, 333 F.3d 498 (3d Cir. 2003), which makes clear that <u>Thomas</u> applies to a certain factual context not present here. We explore both decisions in detail below.[9]

In <u>Thomas</u>, the defendant was employed as a home health care aide to an elderly account holder, who authorized Thomas to complete pre-signed checks, by filling in the amount and name of the payee, to pay for household necessities and other bills. Over a nine- month period, Thomas made out several checks to cash or in her own name allegedly for such purposes as the purchase of groceries; however, in reality, the defendant pocketed the funds for her own benefit. Evidence at trial indicated that the only victim of the defendant's fraud who suffered a loss was the account holder, not the bank. On appeal, after holding that an intent to defraud the bank was a necessary element of bank fraud regardless of what subsection of § 1344 was pled, we endeavored to "decide the thorny question of what is meant by the subsection (1) requirement that the defendant intends to defraud the bank." <u>Thomas</u>, 315 F.3d

---

[9]The distinction between an intent to defraud a bank versus the intent to harm or injure a bank is so subtle that it may well seem trivial. In most contexts, one could understand an intent to defraud a bank as the equivalent of an intent to harm the bank. For instance, the mere act of defrauding a bank by passing false information can be said to harm or injure a bank, as it denies the bank an opportunity to make an informed business decision. Nonetheless, in light of the Defendants' argument and the District Court's juxtaposition of the intent to defraud instruction with the intent to harm instruction, the subtle difference becomes apparent. Were there a specific intent to harm element, a jury might not convict a defendant whose intent was to enrich himself or steal from a third party, yet who lacked any desire to harm or injure the bank.

at 199.  We concluded that, in light of the legislative history that "Congress sought to proscribe conduct that victimized banks . . . [,] harm or loss to the bank must be contemplated by the wrongdoer to make out a crime of bank fraud."  Id. at 200 (quotation and citations omitted).  Thus, under Thomas, conviction under § 1344 requires some proof that the perpetrator of the fraud intended to cause loss or liability – harm – to the bank.  Id. at 199 (holding that "conduct, reprehensible as it may be, does not fall within the ambit of the bank fraud statute when the intention of the wrongdoer is not to defraud or expose to the bank to any loss but solely to defraud the bank's customer").  Because the record indicated that there was no loss to the banks, let alone any intent to cause such a loss, we reversed the defendant's conviction for bank fraud.  See id. at 202 ("Thomas's actions, in fact, demonstrate that she never intended to victimize the banks.  Her only victim was [the elderly account holder].").[10]

Subsequent to our decision in Thomas, we decided Khorozian.  In Khorozian, the defendant was charged with bank

_____

[10]Thomas does not specify whether the intent to cause loss element is a general intent or specific intent requirement. However, given Thomas's use of the conduct/contemplate language, we believe that Thomas understood it to be a general intent requirement, and that § 1344's only specific intent requirement is the specific intent to defraud.  315 F.3d at 200 ("[H]arm or loss to the bank must be contemplated by the wrongdoer to make out a crime of bank fraud.") (citations omitted). The "general intent standard typically only requires that a defendant 'possessed knowledge with respect to the actus reus of the crime.'" Auguste v. Ridge, 395 F.3d 123, 145 & n.23 (3d Cir. 2005) (quoting Carter v. United States, 530 U.S. 255, 268 (2000)).

21

fraud on account of her attempt to deposit $20 million in counterfeit checks on behalf of an individual that she did not know. As part of the fraudulent scheme, the defendant made misrepresentations to the bank as to the purpose of the deposits as well as the identity of the person who accompanied her during visits to the bank. On appeal, we considered whether there was any evidence of loss or liability to the bank, concluding that such a loss existed by virtue of the fact that the bank, had it negotiated the counterfeit checks, would have been exposed to a $20 million loss under the UCC. Khorozian, 333 F.3d at 505 n.5. The defendant argued that, because she did not know that the checks were counterfeit, she had no intent to harm the bank. In response, we cited with approval the First Circuit's decision in United States v. Moran, 312 F.3d 480 (1st Cir. 2002), for the proposition: "Importantly, Moran held the defendants guilty even though they did not specifically intend to cause the bank a loss (i.e., they intended that the loans would be repaid), but rather intended only to make *misrepresentations* that made a loss more likely." Khorozian, 333 F.3d at 505 (emphasis in original). Accordingly, "§ 1344's specific intent requirement is satisfied if an individual commits an act that could put the bank at risk of loss." Id. Thus, Khorozian clarified Thomas's holding regarding the mens rea element of § 1344, making clear that intent to cause a loss or liability, or an intent to harm the bank, is not required. Rather, loss, or risk of loss, goes to the consequences of the fraudulent scheme, and it need not be intended to satisfy § 1344's mens rea requirement of a specific intent to defraud a bank.

22

Khorozian went on to distinguish Thomas on its facts, noting that Thomas and other similar cases "involved fraud on a third party where the bank was merely an 'unwitting instrumentality' in the fraud rather than the 'target of deception.'" Khorozian, 333 F.3d at 505 (quoting Thomas, 315 F.3d at 201)). Accordingly, Khorozian limited Thomas's requirement of an intent to cause loss or liability to the bank to those situations where the bank was merely an "unwitting instrumentality" of the fraud; however, where the bank is a direct target of the deceptive conduct or scheme, § 1344 is satisfied by proof of a specific intent to defraud the bank plus fraudulent conduct (e.g., misrepresentations) which creates an actual loss or a risk of loss. In other words, where the fraudulent scheme targets the bank, there is no requirement that the defendant intended to harm the bank or otherwise intended to cause loss.

We think the Khorozian rule is eminently sensible where the bank is the "target of deception." Id. at 505. The purpose of the bank fraud statute is to protect the "financial integrity of [banking] institutions." See S. Rep. No. 98-225, at 377, reprinted in 1984 U.S.C.C.A.N. 3517. As we noted in Thomas, "Congress enacted the bank fraud statute to fill gaps existing in federal jurisdiction over 'frauds in which the victims are financial institutions that are federally created, controlled or insured.'" 315 F.3d at 197 (quoting S. Rep. No. 98-225 at 377, reprinted in 1984 U.S.C.C.A.N. 3517). In our view, where the bank is the "target of the deception," it makes no difference whether the perpetrator had an intent to harm

23

the bank. Indeed, any conduct that causes loss or harm to a bank is likely to undermine the public's confidence in the integrity of a bank, or otherwise adversely affect the bank's public image, regardless of whether the loss or harm was so intended. In these circumstances, imposing an intent to harm requirement where the bank is the "target of deception" would leave an unnecessary gap in the reach of the bank fraud statute, which we think would contradict Congress' purpose as well as undermine the broad federal interest in protecting financial institutions. Rather, proof of a specific intent to defraud the bank is sufficient under Khorozian.

However, where the bank is not the "target of deception," but rather merely an "unwitting instrumentality," there is the additional concern that § 1344 may be applied in a manner that reaches conduct that falls well beyond the scope of what the statute was intended to regulate. As we noted in Thomas, "[t]he deception of a bank as an incidental part of a scheme primarily intended to bilk a bank customer does not undermine the integrity of banking." 315 F.3d at 200. Thus, to ensure that § 1344 was not applied to conduct falling outside the scope of the bank fraud statute, we imposed the additional requirement of proof of an "inten[t] to cause a bank a loss or potential liability." Id. at 201 (citing United States v. Laljie, 184 F.3d 180, 191 (2d Cir. 1999)). Accordingly, where the perpetrator had an intent to victimize the bank by exposing it to loss or liability, such conduct falls comfortably within the reach of § 1344; however, where there is no evidence that the perpetrator had an intent to victimize the bank, Thomas makes clear that

24

merely an intent to victimize some third party does not render the conduct actionable under § 1344.[11]

We believe this case is clearly controlled by <u>Khorozian</u>. The Defendants' fraudulent conduct clearly targeted the banks, not any third party such as the banks' customers, the debtors from

---

[11]There appears to be a disagreement in the circuits as to whether an "intent to harm" is required under § 1344. For instance, the First Circuit, sitting en banc in <u>Kenrick</u>, examined the common law history of fraud and concluded that the "intent element of bank fraud under either subsection [of § 1344] is an intent to deceive the bank in order to obtain from it money or other property. 'Intent to harm' is not required." 221 F.3d at 29; <u>see also</u> <u>id.</u> (noting that "[a]lthough it may ordinarily accompany a scheme to defraud a bank, an ultimate 'purpose of either causing some financial loss to another or bringing about some financial gain to oneself' is not the essence of fraudulent intent. What counts is whether the defendant intended to deceive the bank in order to obtain from it money or other property, regardless of the ultimate purpose.") (internal citation omitted). In contrast, the Second Circuit has stated that "an intent to harm" is an essential element of bank fraud, although it appears that the Second Circuit interprets an "intent to harm" in a manner that focuses principally on whether the fraudulent conduct causes loss or a risk of loss. <u>See</u> <u>United States v. Chandler</u>, 98 F.3d 711, 715-16 (2d Cir. 1996) (no plain error where district court failed to give "intent to harm" instruction; finding that the intent to deceive is the functional equivalent of the essential finding of intent to harm, and upholding conviction on grounds that the bank "was necessarily exposed to a potential loss"); <u>see also</u> <u>United States v. Chacko</u>, 169 F.3d 140, 148-49 (2d Cir. 1999) (holding that an intent to harm can be inferred from conduct that "has the effect of injuring as a necessary result of carrying it out"); <u>Crisci</u>, 273 F.3d at 240 (upholding bank fraud conviction where the defendant cashed fraudulent checks with forged endorsements, even though checks never presented to bank, on the grounds that jury could find that he "intended to harm a bank"; dispositive of the intent to victimize was the fact that the defendant's conduct put the bank at a risk of loss, not any intent to cause that loss.).

whom the cars had been repossessed. The Defendants misrepresented to the banks that they would auction the cars at the highest price; they diverted the cars to Carriage Trade's inventory despite their promises to the contrary; they prepared false bills of sale that were sent to the banks; and they occasionally overstated the extent of the physical damage of the cars to the banks in an effort to justify the low prices. Thus, the banks in this case were more than incidental victims or mere unwitting instrumentalities as was the case in Thomas. Rather, like the bank in Khorozian, the banks here were the direct targets of the misrepresentations and the fraudulent scheme. Moreover, the Defendants had little, if any, contact with the banks' customers.

The dissent disputes our reading of Khorozian, asserting that it can be read "as being entirely faithful to Thomas." Dis. Op. at 7-8. However, in our view, the dissent's reading of Khorozian is unpersuasive, as it ignores its language and holding. While Khorozian correctly notes that the specific intent element of § 1344 is the specific intent to defraud the bank, 333 F.3d at 503, nowhere does the opinion expand the mens rea requirement, as the dissent suggests, to also require an intent to cause risk of loss. This reading of Khorozian is borne out by an examination of the First Circuit's decision in Moran, upon which Khorozian heavily relied, which followed the First Circuit's prior en banc unanimous decision in Kenrick, which unambiguously concluded that there is no intent to harm, or intent to cause loss, requirement under § 1344.

26

Moran, 312 F.3d at 488-89 (citing Kenrick, 221 F.3d at 30).[12]

Applying the foregoing principles to the jury instructions in this case, we believe that the District Court did not err in instructing the jury that "[i]ntent to harm the bank is not required." The jury instructions, taken as a whole, instructed the jury that an intent to defraud the banks had to be found before the Defendants could be convicted of bank fraud. See App. at 2135a ("The intent element of bank fraud is an intent to deceive the bank in order to obtain from it money or other property."). Khorozian requires no more with respect to the instruction of the jury as to § 1344's intent element.

The Defendants allege one final error in the District Court's bank fraud instructions. In response to a written question from the

---

[12]The dissent also contends that by failing to instruct the jury that an intent "to victimize the bank" was required under § 1344, the District Court's instructions permitted the jury to convict under an erroneous disjunctive reading of the bank fraud statute, and more specifically, subsection (2), in violation of Thomas. Dis. Op. at 5-6. We disagree. Thomas held, and Khorozian reaffirmed, that the "sine qua non of a bank fraud violation, no matter what subdivision of the statute it is pled under, is the intent to defraud the bank." Thomas, 315 F.3d at 197; Khorozian; 333 F.3d at 503. Here, the District Court clearly instructed the jury that the mens rea element of § 1344 was the "intent to deceive the bank in order to obtain from it money or other property." Given that the jury could not convict the Defendants without a finding of such an intent, there was simply no risk that the Defendants were convicted under a disjunctive reading of the bank fraud statute. Accordingly, the jury instructions were consistent with Thomas and Khorozian's holding that § 1344 must be read in the conjunctive.

27

jury, the District Court provided a supplemental oral instruction regarding the elements of bank fraud: "To prove a charge of bank fraud, the <u>defendant</u> must establish each of the following elements beyond a reasonable doubt." <u>See</u> App. at 2160a (emphasis added). Clearly, this was in error, as the burden of proof was on the Government. Notably, the Defendants did not raise any objection to this before the District Court, nor did they raise this error in their opening briefs to this Court. Nevertheless, it is obvious that the District Court's mistaken use of the word "defendant" did not constitute plain error as it could not have prejudiced the Defendants. <u>See</u> <u>United States v. Williams</u>, 299 F.3d 250, 257 (3d Cir. 2002) (no plain error where error does not cause prejudice). When read in the context of the entire instructions to the jury, there is no doubt that the jury understood that the burden of proof was on the Government at all time to prove every element of the crime charged.

### B. The meaning of "fraud"

The District Court instructed the jury, over Defendants' objection, that the fraud element of a bank fraud conviction is defined as follows:

> Members of the jury, the first element is that the government must prove beyond a reasonable doubt that there was a scheme or artifice to defraud a financial institution, or a scheme or artifice to obtain

28

any of the money owned by or under the custody or control of a financial institution by means of false or fraudulent pretenses, representation or promises.

. . .

The term false or fraudulent pretenses, representations or promises, means a statement or an assertion which concerns a material or important fact, or material or important aspect of the matter in question that was either known to be untrue at the time that it was made or used, or that it was made or used with reckless indifference as to whether it was, in fact, true or false and made or used with the intent to defraud.

. . .

The fraudulent nature of a scheme is not defined according to any technical standards. *Rather, the measure of a fraud in any fraud case is whether the scheme shows a departure from moral uprightness, fundamental honesty, fair play and candid dealings in a general light of the community.*

Fraud embraces all of the means which human ingenuity can devise to gain advantage over another

29

> by false representation, suggestions or suppression of truth or deliberate disregard or omission of truth.

App. at 2132a-2134a (emphasis added). Focusing on the emphasized sentence above, the Defendants contend that the jury instruction defining fraud as a deviation from moral uprightness or fairness was erroneous. In particular, the Defendants contend that the instruction was too vague, permitting conduct to be criminalized without sufficient specificity, and failing to ensure that "ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). Second, the Defendants, citing United States v. Lanier, contend that the instruction in question was overbroad to the extent that it reached conduct that is not covered by § 1344, thereby putting the court in the position of developing common law crimes. See 520 U.S. 259, 267 n.6 (1997) (noting that courts are not in the business of creating common law crimes, and that "[f]ederal crimes are defined by Congress"). Finally, the Defendants contend that the instruction invited the jury to impose purportedly objective criteria of morality and fairness to convict them when, in fact, § 1344 requires proof that a defendant had the specific intent to defraud.

We have, in the past, defined fraud with reference to the elastic concepts of morality and fairness when discussing the reach of the federal fraud statutes. See United States v. Goldblatt, 813

30

F.2d 619, 624 (3d Cir. 1987) ("The term 'scheme to defraud,' however, is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community."); see also United States v. Trapillo, 130 F.3d 547, 550 n.3 (2d Cir. 1997); United States v. Schwartz, 899 F.2d 243, 246-47 (3d Cir. 1990); United States v. Keplinger, 776 F.2d 678, 698 (7th Cir. 1985); United States v. Bohonus, 628 F.2d 1167, 1171 (9th Cir. 1980); United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir. 1979); United States v. Gregory, 253 F.2d 104, 109 (5th Cir. 1958). However, as a tool for construing the scope of the federal fraud statutes, the formulation of fraud as a departure from moral uprightness and fairness has come under increasing criticism. In particular, the ambiguity inherent in concepts such as morality and fairness has been thought to provide constitutionally inadequate notice of what conduct is criminal, involve judges in the creation of common law crimes, and place excessive discretion in federal prosecutors. See United States v. Panarella, 277 F.3d 678, 698 (3d Cir. 2002) (noting that such formulations of fraud "do little to allay fears that the federal fraud statutes give inadequate notice of criminality and delegate to the judiciary impermissible broad authority to delineate the contours of criminal liability"); Matter of EDC, Inc., 930 F.2d 1275, 1281 (7th Cir. 1991) (noting that "[s]uch hyperbole . . . must be taken with a grain of salt. Read literally it would put federal judges in the business of creating new crimes; federal criminal law would be the nation's moral vanguard.");

31

United States v. Holzer, 816 F.2d 304, 309 (7th Cir. 1987) (noting that the aforementioned definition of fraud "cannot have been intended, and must not be taken literally. It is much too broad and, given the ease of satisfying the mailing requirement [of mail fraud] would put federal judges in the business of creating what in effect would be common law crimes, i.e., crimes not defined by statute."), judgment vacated on other grounds, 484 U.S. 807 (1987); United States v. Brown, 79 F.3d 1550, 1556 (11th Cir. 1996).

Defendants correctly note that courts, including this one, have typically used the morality and fairness formulation of fraud only as a statement of statutory intent or as a means of defining the scope of the federal fraud statutes; we have not, however, examined the proprietary of using such language in jury instructions. We admit that the concerns we expressed in Panarella, as well as by other courts, are magnified in the context of jury instructions, as it is probable that the jury will be swayed by elastic formulations of morality and fairness in the absence of sufficient context and guidance from the court. Indeed, had the highlighted language challenged by the Defendants been given to the jury in isolation, we would be presented with a very different matter, as it is plain that not every departure from moral uprightness and fairness can or will constitute a scheme to defraud within the meaning of the bank fraud statute.

However, we cannot look at the challenged instruction in isolation, as the Defendants do. We believe that the instructions,

taken as a whole, properly instructed the jury as to the proof required to establish a "scheme to defraud" as well as the appropriate intent to defraud, which we have discussed previously. The jury could not have convicted the Defendants merely for failing to adhere to standards of moral uprightness or fundamental honesty. Indeed, we note that this Court recently affirmed the use of a very similar jury instruction in Khorozian, with the only difference being the Khorozian instruction did not contain the language "moral uprightness."[13] 333 F.3d at 508-09 (scheme or artifice may be found "where there has been a departure from basic honesty, fair play and candid dealings"); see also United States v. Frost, 125 F.3d 346, 371-72 (6th Cir. 1997) (upholding use of similar formulation of fraud in context of detailed jury instruction which, as a whole, provided that the jury could not convict defendants merely for not having acted according to fundamental honesty or moral uprightness"); United States v. Dobson, – F.3d –, 2005 WL 1949935, at *6 (3d Cir. Aug. 16, 2005) (affirming use of instruction defining scheme to defraud as involving "a departure from fundamental honesty, moral uprightedness, or fair play and candid dealings in the general light of the community"). We

_____

[13]The dissent takes issue with our reliance on Khorozian, noting that the problematic language "moral uprightness" was missing from the Khorozian charge, and that Khorozian at least involved a clear instruction on the specific intent element of 18 U.S.C. § 1344. See Dis. Op. at 14-15. As for the latter comment, we have already noted that the jury in this matter was properly instructed as to the mens rea element of 18 U.S.C. § 1344. As for the former, we do not see how the mere inclusion of the phrase "moral uprightness," given the context of the entire jury charge, rendered the instructions erroneous under Khorozian.

continue to have concerns regarding the definition of fraud with reference to such abstract terms as morality and fairness. However, we do not believe that this matter presented any real risk that the District Court's instruction invoking concepts of morality and fairness, when read with the rest of the instructions, allowed for conviction solely based on this formulation of fraud. Accordingly, we find no error.

### C. Good faith

The Defendants requested an instruction that if the jury found the Defendants to have acted in subjective good faith, they must be found not guilty; the Defendants also requested an instruction that the Government bore the burden of proving an absence of good faith beyond a reasonable doubt. The District Court refused to give the good faith instruction, reasoning that the court's instruction as to intent adequately covered the matter and rendered a good faith instruction unnecessary. We reverse "a district court's denial to charge a specific jury instruction only when the requested instruction was correct, not substantially covered by the instructions given, and was so consequential that the refusal to give the instruction was prejudicial to the defendant." United States v. Phillips, 959 F.2d 1187, 1191 (3d Cir. 1992).

In United States v. Gross, 961 F.2d 1097 (3d Cir. 1992), we held, adopting what has become the majority position among the circuits, that a district court does not abuse its discretion in denying

34

a good faith instruction where the instructions given already contain a specific statement of the government's burden to prove the elements of a "knowledge" crime. Id. at 1102-03. In this matter, the District Court's instructions, taken as a whole, adequately defined the elements of the crime, including the intent requirement, thereby making a good faith instruction unnecessary and redundant. If the jury found that the Defendants had acted in good faith, it necessarily could not have found that the Defendants had acted with the requisite scienter. Accordingly, any good faith instruction would have been unnecessary and duplicative.[14]

###   D.   Willful blindness

Over the Defendants' objection, the District Court issued a willful blindness instruction to the jury:

I further instruct you, members of the jury, that the

---

[14]The Eighth and Tenth Circuits have held that a district court abuses its discretion by refusing to give a good faith defense charge even if the court has already given an instruction on the elements of the crime. See United States v. Casperson, 773 F.2d 216, 223-24 (8th Cir. 1985); United States v. Hopkins, 744 F.2d 716, 718 (10th Cir. 1984) (en banc). Although the Defendants request that this Court reconsider Gross, and adopt the position of the Eighth and Tenth Circuits, we see no sound reasons to do so as we continue to believe that Gross was correctly decided. In any event, we note that the Eighth Circuit appears to have moved towards the majority position. See Willis v. United States, 87 F.3d 1004, 1008 (8th Cir. 1996) (finding good faith instruction not required, despite defendant's request, where jury instructions adequately conveyed specific intent requirement).

element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him.

While a showing of negligence or a mistake is not sufficient to support a finding of willfulness or knowledge, a finding beyond a reasonable doubt of a conscious purpose to avoid learning the truth would permit an inference of knowledge. Stated another way, members of the jury, a defendant's knowledge of a fact may be inferred from a deliberate or intentional ignorance of, or a willful blindness to, the existence of a fact. Deliberate ignorance is not a safe harbor for a defendant's culpable conduct. It is entirely up to you, members of the jury, as to whether you find any deliberate closing of the eyes, and as to the inferences to be drawn from such evidence.

App. at 2135a-2136a. The Defendants do not challenge the legal adequacy of the instruction as it was worded, but rather the propriety of giving the instruction in this case. In particular, they contend that there was no support in the record that any defendant, or any person who could bind the corporate defendant Dantone, had deliberately avoided learning about the fraudulent scheme.

36

A willful blindness instruction is often described as sounding in "deliberate ignorance." United States v. Wert-Ruiz, 228 F.3d 250, 255 (3d Cir. 2000). "We have upheld a district court's willful blindness instruction where the charge made clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." Khorozian, 333 F.3d at 508 (quoting United States v. Stewart, 185 F.3d 112, 126 (3d Cir. 1999)). A willful blindness instruction is also proper when "[t]he jury could have found that [the] defendant deliberately closed his eyes to what otherwise would have been obvious to him." Id. We have noted that it is not inconsistent to give a charge as to both willful blindness and actual knowledge so long as the willful blindness charge is supported by sufficient evidence. See Wert-Ruiz, 228 F.3d at 255 (citation omitted). Accordingly, the mere fact that the evidence supports a finding of actual knowledge of a fact in question on the part of the Defendants does not bar the District Court from also giving a willful blindness charge to the jury so long as the record supports the provision of such an instruction.

On the record before us, we believe that there was sufficient evidence to support the District Court's willful blindness charge to the jury. In particular, evidence presented at trial permitted a finding by the jury that Dominic Conicelli, Sr., the sole shareholder and president of Dantone, may have been deliberately ignorant to the deceptive practices that Dantone was engaged in, or that the

cars were not being auctioned as promised. For instance, in March 1995, one of the ten banks – Midlantic Bank – discovered that Carriage Trade had apparently sold one of their automobiles to Carol Leahy, the Defendant's sister, for approximately $3,500 more than had been remitted to Midlantic as auction proceeds. When confronted by Midlantic, Smith fabricated the story that the car in question had extensive electrical damage in the amount of $3,000 and had to be towed through auction, thus bringing in a low price. Later, during a meeting between Midlantic and Conicelli, Conicelli admitted that Smith had lied regarding the electrical damage, becoming upset and offering to fire Leahy, yet he continued to insist that the car in question had been auctioned, rather than misappropriated by Carriage Trade and sold to Carol Leahy. While Conicelli's statement could evidence actual knowledge, it could also be read as suggesting a high probability that Conicelli was deliberately ignorant of his employees' fraudulent scheme, despite having learned facts indicating that the Midlantic's repossessed car had not been auctioned as represented to the bank.

The Government also points to testimony of an FBI special agent at trial regarding his interview of Conicelli during a search of the offices of Carriage Trade on March 5, 1996. The FBI agent testified that, during the interview, he confronted Conicelli with two sets of documents – the true bill of sale and the false bill of sale for the Carol Leahy car. When shown the documents, Conicelli stated that he remembered the car and that he had

38

personally asked the dealer not to take possession of the car because she had wanted to purchase it. The FBI agent then proceeded to question Conicelli about other instances where an automobile consigned to Carriage Trade for auction was in fact never auctioned, but Conicelli denied having any knowledge of such transactions. The FBI agent then informed Conicelli that there may have been at least 150 instances where automobiles had not been auctioned as represented to the banks but instead sold as part of Carriage Trade's inventory. Conicelli responded by expressing doubts about this and asked to see evidence of such irregularities. When shown two such examples – bills of sale for the same car, one false and one true, indicating that Carriage Trade had sold the cars in a second sale to a buyer for a higher price than what was reported to the bank – Conicelli reacted with denial and disbelief, as the FBI agent testified at trial: "He said something to the effect, I don't know what the heck – I don't remember these cars." App. at 1566a-67a. Based on Conicelli's reaction to the allegations made by the FBI agent, a jury could infer that, despite his position with Carriage Trade, he was willfully blind to the scheme his company and his employees were engaged in, despite substantial documentary evidence of such a fraudulent scheme.

Evidence relating to Leahy also supported a willful blindness charge. At trial, it was shown that Leahy maintained a detailed ledger which kept track of the profits of the fraudulent scheme. Moreover, Kelly Gruver, an immunized former employee of Carriage Trade who was responsible for preparing and mailing

checks to the banks, testified that between 1993 and 1996, Leahy would bring her bills of sale already filled out with the names of the banks as sellers, third parties as buyers, and prices. Leahy told her to enter the cars into Carriage Trade's inventory and then send checks to the banks, as if the cars had been auctioned. Despite this conduct, counsel for Leahy argued at trial that the Defendant did not know that the cars were being falsely auctioned, or that any of his conduct, from maintaining the ledger or his instructions to Gruver to issue checks to the banks while registering the cars in Carriage Trade's inventory, was fraudulent or deceptive. E.g., App. at 3180a, 3192a-3196a; see also Reply Br. of Leahy at 3, 8. In our view, there is sufficient support in the record to justify a willful blindness charge, as a jury could find that Leahy was aware of certain facts which indicated that there was a high probability that Carriage Trade was engaged in a scheme to defraud the banks, and yet deliberately avoided learning about the fraudulent nature of the scheme.[15]

_____

[15]Neither the Defendants, nor the Government, discuss the evidence to support a willful blindness charge against Smith. Assuming arguendo that the District Court's provision of a willful blindness instruction as to Smith was in error, we believe that, given that the instruction itself contained the proper legal standard, which the Defendants do not contest, and given the ample evidence of actual knowledge on the part of all Defendants, as discussed in Part IV infra, any error in the instructions would have been harmless. See United States v. Mari, 47 F.3d 782, 785-86 (6th Cir. 1995) (holding that provision of a willful blindness charge that is not supported by the record but that contains the proper legal standard is harmless as a matter of law because the jury "will consider the theory, and then dismiss it for what it is – mere surplusage, a theory of scienter that is insufficient to support the

## E.     Intangible Rights

The District Court instructed the jury that "[a] scheme or artifice includes a scheme to deprive another person of tangible, as well as intangible property rights. Intangible property rights means anything valued or considered to be a source of wealth, including, for example, the right to honest services." App. at 2132a-2133a. Defendants contend that this instruction was in error because there was no allegation anywhere in the Indictment nor any proof at trial to support such an instruction. The Government concedes that the intangible rights charge to the jury was in error, admitting that it "never suggested to the jury an intangible rights theory; the case was exclusively presented as a financial fraud." See Gov't Br. at 77.

Defendants argue that they properly objected to the provision of the intangible rights instruction. However, we disagree that any such objection was preserved as it is clear from the record that defense counsel objected to other portions of the bank fraud charge, such as the proper reading of § 1344, but not as to the intangible rights charge. See United States v. Jake, 281 F.3d

conviction") (citing Griffin v. United States, 502 U.S. 46 (1991)); United States v. Sasser, 974 F.2d 1544, 1553 (10th Cir. 1992) (holding "that when sufficient evidence of a defendant's guilt exists, the tendering of a 'willful blindness' instruction is harmless beyond a reasonable doubt even when the government does not introduce evidence to support such a theory"); Mattingly v. United States, 924 F.2d 785, 792 (8th Cir. 1991) (holding that erroneous provision of willful blindness charge was harmless where there was sufficient evidence to support actual knowledge); cf. United States v. Syme, 276 F.3d 131, 136 (3d Cir. 2002) (citing Griffin).

41

123, 130 (3d Cir. 2002) ("[A]n objection must . . . be sufficiently precise to allow the trial court to address the concerns raised in the objection. Thus, counsel must state distinctly the matter to which that party objects and the grounds of the objection.") (internal citation and quotation omitted); see also United States v. Davis, 183 F.3d 231, 252 (3d Cir. 1999). Accordingly, we will apply plain error review.

To establish plain error, the Defendants bear the burden of showing that (1) an error was committed; (2) the error was plain, that is, clear and obvious; and (3) the error affected their substantial rights. See United States v. Dixon, 308 F.3d 229, 234 (3d Cir. 2002); United States v. Vasquez, 271 F.3d 93, 99 (3d Cir. 2001) (en banc). Once these elements are established, an appellate court may exercise its discretion and reverse the forfeited error if "the error [] seriously affects the fairness, integrity, or public reputation of judicial proceedings." Dixon, 308 F.3d at 234 (internal quotation omitted). We have previously cautioned that "it is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." United States v. Gordon, 290 F.3d 539, 545 (3d Cir. 2002) (internal quotation omitted).

It is clear that the intangible rights instruction was given in error as the Government did not present any evidence supporting such an instruction, nor did it allege an "intangible rights" theory. However, it is also clear that the erroneous instruction did not and

could not cause any prejudice to the Defendants or diminish their rights. See Williams, 299 F.3d at 257 ("An error affects the substantial rights of a party if it is prejudicial."). In particular, the Government's theory of the case was that the Defendants' conduct perpetrated a financial fraud on the banks, resulting in an actual loss of more than $400,000, the approximate difference between the false sales price and the actual price, as well as the risk of loss. Moreover, the District Court properly instructed the jury that both the scheme to defraud, as well as the intent to defraud, had to be directed at the banks. Thus, in these circumstances, we do not believe that a single erroneous jury instruction as to intangible rights could have been a possible basis for the jury's verdict. See United States v. Saks, 964 F.2d 1514, 1522 (5th Cir. 1992) (finding no plain error where erroneous intangible rights instruction given to jury because government did not rely on or present evidence in support of an intangible rights theory); United States v. Perholtz, 836 F.2d 554, 558-59 (D.C. Cir. 1987); cf. United States v. Holley, 23 F.3d 902, 910-11 (5th Cir. 1994).

### F. Co-schemers' liability

The District Court instructed the jury, in accordance with the Government's request and over the Defendants' objection, as follows:

> I further instruct you, members of the jury, that you may consider acts knowingly done and statements

knowingly made by the defendants [*sic*] co-schemers during the existence of the scheme, and in furtherance of it as evidence pertaining to the defendants, even though they were done or made in the absence of and without the knowledge of the defendants.

*This includes acts done or statements made before the defendants had joined the conspiracy, for a person who knowingly, voluntarily and intentionally joins an existing scheme, is responsible for all of the conduct of the co-schemers from the beginning of the scheme.*

Acts and statements which are made before the scheme began or after it ended are admissible only against the person making them, and should not be considered by you against any other defendant.

App. at 2142-2143a (emphasis added). The Defendants contend that the highlighted instruction – permitting the jury to attribute acts and statements of a co-schemer to a defendant made prior to the defendant's entry into the scheme – was in error.

While we have addressed the circumstances in which the jury may be instructed that the acts and statements of a co-conspirator may be attributed to a defendant for purposes of

44

determining guilt of the substantive offense, see United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001) (citing Pinkerton v. United States, 328 U.S. 640, 647 (1946)), we have apparently not yet addressed the circumstances in which a co-schemer instruction may be properly given. We note, however, that the Ninth Circuit has addressed co-schemers liability in some detail. See, e.g., United States v. Lothian, 976 F.2d 1257, 1262-63 (9th Cir. 1992); United States v. Stapleton, 293 F.3d 1111, 1117 (9th Cir. 2002). In particular, in a federal mail and wire fraud proceeding, the Ninth Circuit explained: "Just as acts and statements of co-conspirators are admissible against other conspirators, so too are the statements and acts of co-participants in a scheme to defraud admissible against other participants. We also apply similar principles of vicarious liability. Like co-conspirators, 'knowing participants in the scheme are legally liable' for their co-schemers use of the mails or wires." Stapleton, 293 F.3d at 1117 (quoting Lothian, 976 F.2d at 1262-63). Nevertheless, under the approach of the Ninth Circuit, the District Court's instruction in this case may well have been erroneous to the extent that it permitted the jury to consider acts and statements of a co-schemer performed prior to the defendant's entry in the scheme. See Stapleton, 293 F.3d at 1117 ("The acts for which a defendant is vicariously liable must have occurred during the defendant's knowing participation or must be an inevitable consequence of actions taken while the defendant was a knowing participant.").

However, assuming arguendo that the Ninth Circuit's

45

approach is correct, which we need not decide, any error here was harmless on the facts of this case. Cf. United States v. Simon, 995 F.2d 1236, 1244-45 (3d Cir. 1993).[16]  Simply put, on the facts of this case, there was no possibility that the jury could have attributed the acts or statements of one co-schemer to another defendant that were made prior to the defendant's entry into the scheme to defraud.  The Indictment charged that the scheme to defraud began in at least March 1993.  Moreover, Edward Stigben, a co-schemer with the Defendants, testified at trial that the Defendants were involved in the scheme to defraud since at least 1991 or 1992. See App. at 447a, 451a.  Moreover, the Government did not present evidence of a scheme to defraud existing prior to the Defendants' involvement.  Thus, as there was no evidence of a prior scheme, the jury could not have attributed a co-schemer's acts or statements to the Defendants prior to the Defendants' entry into the scheme.  Accordingly, any error in the District Court's instructions was harmless.

---

[16]For purposes of harmless error review, in Simon, we noted that erroneous jury instructions which are properly objected to may be characterized as constitutional or non-constitutional in nature. For non-constitutional errors, we have held that "unless the appellate court believes it is highly probable that the error did not affect the judgment, it should reverse."  Simon, 995 F.2d at 1244 (quotation and citation omitted).  By contrast, for constitutional errors, "the test is whether the evidence is so overwhelming that it is beyond reasonable doubt that the verdict would have been the same had the error not been committed."  Id. at 1245 (internal quotation and citation omitted).  Here, we need not decide whether the co-schemers' instruction, assuming it was erroneously given, should be subject to constitutional or non-constitutional review as we would arrive at the same conclusion under either test. Id.

## IV.  SUFFICIENCY OF THE EVIDENCE

The Defendants contend that there was insufficient evidence to sustain their bank fraud convictions on at least two grounds: first, that there was no evidence that the banks suffered any loss as a result of the scheme to defraud and, second, that there was no evidence that they had any intent to defraud the banks as opposed to the banks' customers, the debtors from whom the cars had been seized.  "[A] claim of insufficiency of the evidence places a very heavy burden on the appellant."  United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998).  We must "view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  See id. (citations and quotations omitted).  After reviewing the record in this matter, we conclude that there was sufficient evidence to sustain the Defendants' convictions.

### A.     Evidence of loss by the banks

As explained above, § 1344 requires that the fraudulent scheme exposed the bank to some type of loss.  E.g., Khorozian, 333 F.3d at 504-05.  As an initial matter, we note that the loss or liability that must be caused by the scheme to defraud can either be an actual loss by the bank, or it can be a potential loss, what we termed in Khorozian the "risk of loss."  Id.  Nor is a financial loss the only cognizable injury under the bank fraud statute: we have

recognized that exposing a bank to civil liability is sufficient under the bank fraud statute. See id. at 505 n.5 (noting that the UCC makes a bank liable to a drawer of a check if it pays on a forged indorsement). On the record before us, and viewing the evidence in the light most favorable to the Government, there is sufficient evidence to support the finding that the Defendants' conduct exposed the banks to a risk of loss.

In particular, by not returning the full sale price of the automobiles to the banks, the Defendants increased the amount of the deficiencies that the banks had to collect from the banks' customers indebted on the loans. One banker explained what was meant by deficiency: "[t]he balance [of the loan to the borrower] less the proceeds of the sale." App. at 2896a. Given that the banks were already dealing with customers who had defaulted on their loan obligations, a jury could readily infer that the Defendants conduct made it more likely that the banks would not be able to collect the full deficiencies.

Testimony at trial indicated that it was normal that after the auction of an automobile, a deficiency on the outstanding loan would still remain, and that it was rare for an auction to fetch a price sufficient to cover the entire loan amount. Chris Mulvihill of Midlantic Bank explained: "[w]hat would happen is the customer would have a loan. The loan was generally more than the value of the car was for. We would sell the car. Whatever we got for the car, the customer had to pay that difference back." App. at 1113a.

Similarly, Louis Credle of the Police and Fire Federal Credit Union testified that "[i]f we have to repo the car, then it goes to auction, and then we have a default balance . . . [.] [T]hat would be normal." App. at 233a. Another banker also noted that "on one or two rare occasions[,] a customer had so much equity in the car when we sold it, they ended up getting money back, so that doesn't happen all the time. But it's very rare." App. at 151a.

Because it was routine for the auction to yield a price insufficient to cover the amount of the outstanding debt, bank representatives testified that it was critical for the banks to get the best possible price so as to minimize the amount of the deficiency. For instance, one banker testified that his bank sent cars to the auction "to minimize our cost on [those] vehicle[s] so that we could attain a high value of return and cut our deficiency." App. at 88a. Another banker testified that, because each repossessed car was the subject of a loan, obtaining the highest price at auction meant that the bank "could eliminate the deficiency balance as much as possible" and "reduce the loss on that loan." App. at 2992a. Similarly, another banker testified that it was important for the bank to get the highest price possible at auction because lower prices increased the amount of the deficiency the bank faced, a balance that could ultimately have to be written off against the banks' reserves for loan losses. App. at 2883a, 2896a-97a; see also App. at 1113a (testimony of bank representative that "we wanted to sell the cars for the most amount we could in order to reduce the bank's losses"). Once the cars had been auctioned, the banks

typically looked to the customer for satisfaction of any deficiency balance. See App. at 2896a (testimony that following the auction, the bank attempts "to make arrangements for him [the customer] to pay the deficiency"). However, testimony at trial confirmed the obvious proposition that the customers from whom the cars had been repossessed, having failed once to pay their loan obligations, were unlikely to pay additional money towards satisfying any remaining deficiency. As one banker noted, it was important to get the best price because "most of the time [the customers] are not paying you." App. at 110a. Viewing the evidence in the light most favorable to the Government, a jury could readily infer that the Defendants' conduct, by increasing the amount of deficiency the banks had to pursue from their riskiest customers, exposed the banks to a risk of loss, i.e., the risk that the banks' customers would not be able to satisfy the greater deficiency balance.[17]

Not only did the Defendants' conduct expose the banks to the risk of non-payment of a greater deficiency balance, the Defendants' conduct threatened to impair the banks' ability to

_____

[17]We also reject the Defendants' suggestion that because the banks retained a legal remedy against the borrowers to collect any outstanding deficiency, the banks could not be placed at a risk of loss. The fact that a bank has the ability to pursue a legal remedy to collect an unpaid deficiency against a debtor does not mean that, in every instance, it would have done so, as it would have to weigh the costs of litigating the deficiency claim versus the probability of a favorable outcome. See United States v. Autorino, 381 F.3d 48, 53 (2d Cir. 2004) (noting that the FDIC's protection against loss under the UCC was undermined by the costs of pursuing legal action).

50

pursue legal remedies against the deficiency debtors. Article 9 of the UCC requires a secured creditor to dispose of collateral in a "commercially reasonable" manner. See 13 Pa. Cons. Stat. § 9504 recodified at 13 Pa. Cons. Stat. § 9610; N.J. Stat. Ann. § 12A:9-504 recodified at N.J. Stat. Ann. § 12A:9-610. Indeed, bank representatives testified that selling the automobiles in a commercially reasonable manner was critical to preserving the bank's ability to seek a deficiency judgment in a subsequent proceeding against the automobile's owner. E.g., App. at 1113a ("We also wanted to be able to exercise a commercially reasonable sale, so that we could recover the deficiency balance for these cars."). The banks chose to consign the automobiles to Carriage Trade for auction precisely because they sought to comply with the requirements of state law. E.g., App. at 1114a ("We felt that [the auction was best] because of the fact that there were more bidders bidding on the car, that we would get a better price. These little lots that were selling the vehicles generally was a handful of people bidding on the cars, but literally hundreds of people attended the auctions. So the idea was to have more action, more people making bids on the car.").

However, the Defendants' conduct deprived the banks of the opportunity to dispose of their collateral in a "commercially reasonable" manner, thereby exposing the banks to a risk that they would be unable to pursue successful deficiency claims against their debtor customers. For instance, one bank representative noted that because all they had in their possession were the false bills of

51

sale, which were evidence that the cars were effectively bought by Carriage Trade for its own inventory at artificially low values, they would have difficulty in court in establishing a claim for a deficiency. See App. at 1125a ("We needed this documentation that the auction provided, as I stated earlier, in order to be able to collect the rest of the money that the customer may owe. And certainly if the same auction that the car was auctioned at had purchased the car, that would create a problem if we went to court and tried to get that money back."); App. at 1275a (noting that the false bills of sale in the banks' possession "didn't reduce our losses" but rather "increased our losses" because "if we had to go to court ourselves, if were suing someone on a deficiency, we'd have to have the bill of sale"); App. at 881a (noting that it was important to demonstrate that the car had been sold for the most money because it "showed that . . . it [the car] went to an auction where they [the customer] know you didn't give the car away, so to speak"); App. at 1113a-14a (noting that a "commercially reasonable" sale was important because "we were pursuing the customer for the rest of the money that was owed" and "we needed to be able to prove that we did the best job we could in selling the car"). Thus, the evidence supported a jury finding that the Defendants' conduct exposed the banks to a risk of loss in the sense that the disposition of the collateral could be found to be commercially unreasonable, thereby impairing the banks' ability to collect on any deficiency balances.

Despite the evidence of risk of loss to the banks caused by

52

the scheme to defraud, the Defendants insist that the Government was required to introduce specific evidence as to each of the 311 cars that the banks in fact had a deficiency balance remaining following Carriage Trade's remittance of the fraudulent sales price. In particular, the Defendants contend that because there is no evidence that the banks suffered any uncollected deficiencies as to the defaulted borrowers with respect to any of the 311 cars, the jury could not infer whether a bank was harmed by less than the full sale price the Defendants returned.[18] We reject the Defendants' argument because it conflates a showing of actual loss with the risk of loss. Evidence of uncollected deficiencies with respect to each of the 311 cars goes only to whether the banks suffered an <u>actual</u> loss, in fact, on the deficiency balance; to the extent that some banks may have successfully collected the higher deficiency balances from the borrowers does not negate the fact that the Defendants' conduct exposed the banks to a risk of loss, i.e., the threat of non-payment by the bank's riskiest customers as well as the impairment of the banks' legal remedies to collect on the

---

[18]One of the 311 cars was a 1994 Toyota, on which Midlantic Bank was owed $14,102.49 on the loan by the car's legal owner and debtor. The car was improperly sold by Defendants to Carol Leahy for $18,000, and Carriage Trade still paid $14,184 to Midlantic Bank, which was greater than the remaining loan obligation. In other words, Midlantic Bank recovered <u>all</u> of its debt and was made whole with respect to this automobile. There was, according to the Defendants, no actual loss suffered by Midlantic Bank as a result of their conduct. Extrapolating from this example, the Defendants contend that there was no evidence introduced by the Government that, with respect to the vast majority of the cars, the banks suffered any loss.

53

deficiencies. See Khorozian, 333 F.3d at 505 n.6 ("That Hudson United never actually suffered harm is also immaterial to Khorozian's defense. Section 1344 only requires that the bank be placed at risk of loss."); Monostra, 125 F.3d 183 at 188 ("As we have noted in the past, the government need not show that the banks actually incurred a loss in order to prove a scheme or artifice to defraud. Exposure to potential loss is sufficient."). The evidence of the loan balances with respect to the 311 cars is irrelevant to showing a risk of loss. The fact that the Defendants' scheme to defraud may have fortuitously failed to impede the banks' ability to collect on some of the deficiencies does not mean that the scheme did not involve a risk of loss to the banks.[19]

---

[19]In addition to risk of loss, the Government argues that the Defendants' fraudulent scheme exposed the banks to an actual loss in the amount of $418,657, the total difference pocketed by the Defendants between the low sale price reported to the banks and the actual sale price received by Carriage Trade. The Defendants, however, contend that the $418,657 did not represent the actual loss to the banks as the money properly belonged to the owners of the automobiles, not the banks. In particular, the Defendants rely extensively on Article 9 of the Uniform Commercial Code ("UCC") governing secured transactions and as adopted in Pennsylvania and New Jersey, which rests title of repossessed automobiles in the individual owners of the cars, not the banks. Because the banks were not the legal owners of the 311 automobiles in question, the Defendants argue that the $418,657 was money that was taken from the legal owners of the automobile, and not the banks. However, we need not reach this argument because we have found sufficient evidence to support a risk of loss to the banks.

We do note that we are unpersuaded by the Defendants' criticism of the Government's statements at trial and in its brief to this Court that the "[t]he cars did not belong to Carriage Trade,

54

Finally, the Defendants contend that not every bank representative testified with sufficient clarity that his or her particular bank was exposed to any risk of loss as a result of the scheme to defraud. We disagree. Viewing the evidence in the light most favorable to the Government, there was sufficient evidence for a jury to infer that each bank faced a comparable risk of loss from the Defendants' fraudulent scheme. Certainly, there is no requirement that each bank representative had to testify using the magic words "risk of loss" to support a jury's finding to this effect. The Government's evidence, taken as a whole, was sufficient to support a jury finding of a risk of loss as to each bank.[20]

---

they belonged to the banks." E.g., Gov't Br. at 49. As the Defendants correctly note, under the UCC as adopted in Pennsylvania and New Jersey, the banks were not legal title holders of the cars, but rather priority lien holders. That said, the Government's statement that the cars "belonged to the banks," as opposed to the cars' legal owners or Carriage Trade, can hardly be claimed to be erroneous. Indeed, the banks had lawfully repossessed the automobiles from individuals who had defaulted on their loan, and, accordingly, the banks' interest in the automobiles was far superior to any interest that the cars' owners had remaining after repossession. This is particularly true given that that banks had the right to dispose of the cars as collateral for their loans pursuant to "commercially reasonable" procedures. See 13 Pa. Cons. Stat. § 9504 recodified at 13 Pa. Cons. Stat. § 9610; N.J. Stat. Ann. § 12A:9-504 recodified at N.J. Stat. Ann. § 12A:9-610.

[20]To avoid any confusion, we note that our decision not to discuss whether the banks suffered an actual loss as a result of the Defendants' scheme should not be read as suggesting that no such loss in fact occurred. Because we are vacating the Defendants' sentences, on remand the District Court will have the opportunity to determine whether the banks suffered an actual loss, and the amount of that loss, for purposes of the Guidelines as well as

55

## B.      Evidence of an intent to defraud the banks

The Defendants contend that there was insufficient evidence to support a finding that they had an intent to defraud the banks, as opposed to the banks' customers, the debtors on the car loans. We disagree.

Testimony at trial permitted the jury to infer that the Defendants knew their conduct was fraudulent and deceptive toward the banks and could cause loss to the banks. For instance, most of the bank representatives testified that they never gave the Defendants permission to purchase the cars for their own inventories, and several bank representatives testified that they affirmatively prohibited Defendants from purchasing the cars for themselves. E.g., App. at 1155 (banker testified that he told the Defendants numerous times "that they weren't allowed to purchase the cars"). As one banker explained, the reason why the banks did not authorize Carriage Trade to purchase the cars for its own inventory, despite several such requests, was that a direct sale to Carriage Trade did not involve "competitive bidding" and "[w]ithout competitive bidding, you really can't establish a proper deficiency." App. at 1262a.

Moreover, evidence at trial indicated that Carriage Trade

restitution. We note that the proof of actual loss for purposes of the bank fraud conviction is not the same as proof of loss for purposes of calculating "loss" under the Guidelines or for restitution, a point which we consider in more detail in Part V.

held itself out as an auction service able to obtain the best prices for the automobiles in the quickest and most efficient manner. To a large extent, the banks relied on Carriage Trade to value the cars for purposes of resale in a manner that would fetch the best price. As one bank representative testified, "we had no idea of knowing what the condition [of the cars] was. We never saw the cars. And . . . we never went to the auction so we had no idea what the cars looked like. So we put our trust in them informing us of what the condition was, which was pretty much how they based the value of the car." App. at 209a. Another banker testified: "I was pretty much a layperson. What I know is that these people knew more than me. I was relying heavily on them. They were in the business. They were the professionals. They were telling me they were getting the best prices for the car." App. at 1194a-95a; see also App. at 2821a (in opening statement, Government argued: "[i]t was the defendants who held themselves out as being experts on putting value on these cars so that they could be sold for the most money. Then the bank could put that money toward the outstanding loan."). From such evidence, a jury could find that the Defendants knew they were under an obligation to obtain the highest price for the cars and that failure to do so would violate their agreements with the banks. Moreover, the Defendants' argument that they lacked an intent to defraud the banks based on the fact that they returned to the banks the "minimum floor" price set by the banks for each of the 311 cars misses the point. The banks clearly had an expectation, as the Defendants must have known, that if a car was sold above the minimum floor, the banks,

not Carriage Trade, should receive the difference.

The Defendants, however, contend that the Government argued to the jury that their fraudulent scheme injured not only the banks but also the banks' customers, the debtors on the 311 cars. By arguing that the debtors were the victims of the scheme, the Defendants argue that the Government violated Thomas, which requires that the banks be the intended victim of the bank fraud, as opposed to some third party. However, we have already explained earlier in Part III.A why Thomas's "intent to victimize" language is inapplicable to this case, as Khorozian makes clear that no "intent to victimize" is required where the bank is the direct target of the deceptive conduct. In any event, it is well-established that a bank need not be the sole or immediate victim of the fraud. See Moran, 312 F.3d at 489 (citation omitted), cited in Khorozian, 333 F.3d at 505; United States v. McNeill, 320 F.3d 1034, 1037 (9th Cir. 2003); Brandon, 298 F.3d at 311 (citation omitted); Crisci, 273 F.3d at 240. So long as the defendant had an intent to defraud the bank, and the bank suffered loss or risk of loss as a result of the deceptive conduct, § 1344 is implicated even if a third party is also injured as a result of the fraudulent conduct. See also McNeill, 320 F.3d at 1037 (noting that defendant's deception "was plainly directed at First Interstate Bank as well as at the IRS, and the scheme to deceive the bank was essential to McNeill's overall plan. Thus, the bank was not merely an unwitting instrumentality of a scheme to defraud the IRS, it was also a victim of [defendant's] deception."); Crisci, 273 F.3d at 240 (holding that defendant "is not

58

relieved of criminal liability for bank fraud because his primary victim was the employer from which he embezzled funds by submitting fraudulent check requests"). Even if the banks' customers were harmed as a result of the fraudulent scheme, there is still ample evidence that the Defendants' had an intent to defraud the banks within the meaning of <u>Khorozian</u>.[21]

## V. SENTENCING ISSUES

The Defendants raise a number of arguments with respect to their sentences, including the District Court's application of several sentencing enhancements under the Guidelines; the District Court's calculation of loss for purposes of the Guidelines; and the

---

[21]We note in passing that we are unpersuaded by the Defendants' contention that the Government argued to the jury that the primary victim of the fraudulent scheme to defraud were the debtors as opposed to the banks. The Defendants pluck statements from the record in isolation, without reference to context or the rest of the record. However, any suggestion that the Government argued this case on the theory that the borrowers were the victims of the bank fraud is belied by the extensive record in this case, which contains many examples of the Government's theory that the banks were the targets of the scheme and injured as a result of the scheme. As just one example, in its closing argument, the Government clearly argued that the banks were the intended targets of the deception and the injured party: "this is a very simple scheme. The defendants sent the banks false bills of sale, phony documents. They lied to the banks when they said that their [the banks'] cars had been sold at auction. They dummied up the paperwork to fake the sales, and then they sent the bank a check for the low phony purchase price." App. at 3042a.

District Court's imposition of forfeiture and restitution orders. The Defendants also contend that portions of their sentences violate the Eighth Amendment's Excessive Fines Clause. Finally, pursuant to Booker, which was decided while this matter was pending, Defendants assert that their Sixth Amendment rights were violated i) by the imposition of their sentences under the Guidelines and ii) by the District Court's imposition of forfeiture and restitution based on figures calculated by the court rather than by the jury or admitted by the Defendants.

Because the now-advisory Guidelines where mandatory at the time of sentencing, pursuant to Booker we will vacate the Defendants' sentences and remand for further proceedings. See Davis, 407 F.3d at 165. Our doing so eliminates the Eighth Amendment Excessive Fines issue, as to which we express no opinion. What remains is the Defendants' argument that, under Booker, Sixth Amendment protections apply to orders of forfeiture and restitution. Bound by recent Third Circuit precedent,[22] we hold that the Supreme Court's decision in Booker does not render the forfeiture and restitution ordered against the Defendants unconstitutional. Nonetheless, we will vacate the District Court's forfeiture and restitution orders so as to allow the District Court to alter the amounts in the event that there arises an inconsistency with the District Court's revised Guidelines loss calculation. Although we need not consider the Defendants' calculation of loss arguments on the merits because we have already resolved to

---

[22]See note 1, supra.

60

vacate as to this issue, we endeavor below to provide some guidance on how to calculate loss for purposes of the Guidelines.

\* \* \*

The District Court, over the Defendants' objections, found the loss to the victim banks caused by the fraudulent scheme to be $408,970, that is, $418,657 minus $4,687 for certain repair work performed on the cars by the Defendants minus $5,000 that Carriage Trade had paid to Midlantic Bank after its discovery of the fraud. The Defendants contend that the loss calculation was in error, particularly on the basis of our decision in United States v. Dickler, 64 F.3d 818, 824-26 (3d Cir. 1995) (holding that, under U.S.S.G. § 2F1.1, a victim's loss should be calculated by estimation of the actual loss to the victim; "the defendant's gain may be used only when it is not feasible to estimate the victim's loss and where there is some logical relationship between the victim's loss and the defendant's gain so that the latter can reasonably serve as a surrogate for the former."). Because we will vacate the Defendants' sentences and remand for resentencing pursuant to Booker, we will not consider the Defendants' arguments in the first instance. However, we make certain observations in light of Dickler that the District Court should consider on remand.

We note that pursuant to the Federal Rules of Criminal Procedure, a district court "must – for any disputed portion of the presentence report or other controverted matter – rule on the

dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(d)(i)(3)(B) (2003). We have also previously noted that "[a] finding on a disputed fact or a disclaimer of reliance upon a disputed fact must be expressly made." United States. v. Electrodyne Sys. Corp., 147 F.3d 250, 255 (3d Cir. 1998); see also United States v. Cherry, 10 F.3d 1003, 1013 (3d Cir. 1993). In this matter, it is clear that there was a dispute between the asserted loss stated in the presentence report and relied on by the Government, and the loss amount put forth by the Defendants. However, having reviewed the District Court's oral decision at the loss hearing, we believe that the District Court has not resolved with sufficient particularity or specificity the disputes regarding the predicate factual elements for the loss calculation. For instance, we are unable to determine whether the District Court reached the $408,970 figure by calculating the actual loss to the victim banks, or by using the Defendants' gain as a surrogate for the banks' loss. Dickler requires "some explanation of why an estimate of loss based on" the Defendants' data was not feasible. Id. at 827. Moreover, we are unable to determine whether the District Court considered the Defendants' two-market theory, or the basis on which the District Court rejected the Defendants' evidence in this regard.

Although the Government offers a spirited defense of the District Court's loss calculation, contending that the District Court found the Defendants' evidence of two markets as lacking in

62

credibility and self-serving, on the record before us, we are not so sure of the basis of the court's ruling. For instance, the District Court stated that it found "the testimony of the witnesses presented [at the loss hearing], for the most part, lacked some credibility in relationship to the issues here." App. at 2385a. Moreover, the District Court stated that it found the $408,970 amount "to be an accurate and realistic valuation" of the 311 cars. App. at 2385a. What aspects of the factual record the court found credible and incredible is unclear, as is the basis of the District Court's conclusion that the loss amount was "accurate and realistic." Accordingly, on remand, the District Court has the opportunity to reevaluate the evidence to arrive at a satisfactory determination of the banks' losses. However, lest there be any misunderstanding, our decision should not be taken as prejudging the evidence or as compelling a conclusion that the Defendants' evidence must be credited, a task for which, in any event, the District Court is best suited.

## VI. CONCLUSION

For the foregoing reasons, we will affirm the judgments of conviction of the District Court. However, we will vacate the Defendants' sentences and remand for further proceedings consistent with this opinion.

Becker, *Circuit Judge*, concurring and dissenting.

63

I join fully in Parts II, III.C, III.E, III.F, and V of the majority opinion. I join in Part III.D to the extent that it holds that the willful blindness instruction was justified as to Defendant Leahy and constituted harmless error as to Defendants Smith and Dantone, although I will note my reservations regarding the use of that instruction as to Dantone. I join in Part IV except to the extent that it conflicts with my analysis of the elements of bank fraud, set forth in detail below. I do not join in Parts III.A and B or in the judgment because I believe that the majority's resolution of the bank fraud and moral uprightness jury charge issues is incorrect. In particular, I think the majority's discussion of the elements of bank fraud is inconsistent with this Court's decision in *United States v. Thomas*, 315 F.3d 190 (3d Cir. 2002), a fair reading of which compels the conclusion that the jury instructions used here were erroneous.

## I.

The majority finds that the jury instructions used in this case were consistent with our decision in *United States v. Thomas*, 315 F.3d 190 (2002), which interpreted the federal bank fraud statute. I disagree.

## A.

The bank fraud statute reads:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property

64

owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. In *Thomas*, we held that subsection (2) of the statute cannot serve as an independent basis for conviction. Thus, a defendant cannot be convicted of bank fraud solely because he uses false pretenses to obtain money or property that is under the bank's custody but does not belong to the bank; rather, he must also act to "defraud the bank," thus subjecting him to liability under subsection (1). While we acknowledged that this conjunctive reading was in tension with the plain disjunctive language of the statute, we found that it was necessary to effectuate to the statute's purpose "'to protect the federal government's interest as an insurer of financial institutions.'" 315 F.3d at 200 (quoting *United States v. Davis*, 989 F.2d 244, 247 (7th Cir. 1993)). As *Thomas* explained, if a defendant takes money that is under the bank's custody but does not belong to the bank, and in so doing does not subject the bank to any risk of losing its own funds, he has not threatened this interest and therefore has not committed bank fraud.

The District Court in this case, acting before our decision in *Thomas* was issued, instructed the jury that either subsection of the

bank fraud statute could serve as a basis for conviction. It stated:[23]

> The bank fraud law provides that whoever knowingly executes or attempts to execute a scheme or artifice, *one*, to defraud a federally chartered or insured financial institution, *or two*, to obtain any of the moneys, funds, credits, assets, security or other property owned by or under the control or custody of a financial institution by means of false or fraudulent pretenses, representations or promises, shall be guilty of the crime of bank fraud. . . .

> Members of the jury, the first element is that the government must prove beyond a reasonable doubt that there was a scheme or artifice to defraud a financial institution, *or* a scheme or artifice to obtain any of the money owned by or under the custody or control of a financial institution by means of false or fraudulent pretenses, representations or promises.

(emphasis added). Because the District Court instructed the jury that it could convict under *either* subsection of the bank fraud statute, it committed error under *Thomas*.[24]

---

[23]Although *Thomas* was not yet decided when this case went to trial, defendants nonetheless properly objected to the District Court's instruction.

[24]I recognize the seeming perverseness of reversing a conviction because the District Court instructed the jury by reading excerpts from the relevant statute. But *Thomas* clearly stands for

66

The majority does not dispute that the above language, standing alone, is inconsistent with *Thomas*. But it argues that the District Court's error is saved by a later portion of the charge: "The intent element of bank fraud is an intent to deceive the bank in order to obtain from it money or other property." Maj. Op. at 13-14. This instruction, the majority argues, precluded the jury from convicting solely on the basis of subsection (2).

I respectfully disagree. First, the intent instruction was an isolated one, preceded and succeeded by the disjunctive language quoted above. Indeed, when the jury later requested that the District Court repeat the elements of bank fraud, the Court again instructed the jury that it could convict under either subsection of the statute and failed to repeat the sentence setting forth the intent standard.[25] Rather, it simply instructed the jury that it could

the proposition that the bank fraud statute is not to be given its plain meaning.

[25]The jury asked, "Can we have the criteria for bank fraud again, please?" The District Court responded, in pertinent part:

> To prove a charge of bank fraud, the defendant [sic] must establish each of the following elements beyond a reasonable doubt. First, that the defendants knowingly executed a scheme or artifice to defraud a financial institution, *or* a scheme or artifice to obtain any of the money owned by or under the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises.

> Second, that the defendants did so with the intent to defraud . . . .

67

convict if it found that the defendants acted "with the intent to defraud," not, as we required in *Thomas*, "with the intent to defraud *the bank*." *See* 315 F.3d at 197.

Second, the intent instruction simply did not preclude the jury from convicting solely on the basis of subsection (2). As we held in *Thomas*, a defendant who deceives a bank in order to obtain from it money or property belonging to a third party (but in the custody of the bank) does not commit bank fraud, unless he also knowingly subjects the bank itself to a loss or risk of loss. But he could easily have been convicted under these instructions, which stated that "[t]he intent element of bank fraud is an intent to deceive the bank in order to obtain from it money or other property."

What these instructions lack is the critical element of bank fraud identified in *Thomas*: namely, that the defendant must have the intent "to victimize the bank," *see* 315 F.3d at 198, 200, either by taking the bank's own funds or by putting the bank at a risk of future loss or liability. As we held in *Thomas*, "Congress sought to proscribe conduct that 'victimize[d]' banks, which suggests that the bank must be deliberately harmed before the statute is violated. We believe that, given the legislative intent, harm or loss to the bank must be contemplated by the wrongdoer to make out a crime of bank fraud." *Id.* at 200. By not requiring such an intent, the instructions permitted the jury to convict under subsection (2) of the statute.

As *Thomas* made clear, "the intent to defraud the bank"

_____

(emphasis added).

68

requires more than merely "an intent to deceive the bank in order to obtain from it money or other property." *See* 315 F.3d at 200 ("The Government also suggests that mere 'deceptive conduct' toward the bank establishes intent to defraud. We disagree."). Indeed, Thomas herself had the "intent to deceive the bank in order to obtain from it money or other property,"[26] but we held that she did not have the "intent to defraud the bank," which, again, requires an intent to "victimize" the bank by exposing it to a loss or risk of loss. Thus Thomas could have been convicted under these jury instructions, even though, as we held in that case, she did not commit the crime of bank fraud. This fact alone should be sufficient to demonstrate that the jury instructions in this case were flawed.

## B.

The majority makes an additional argument in order to justify the jury instructions used in this case. According to the majority, the *mens rea* requirement set forth in *Thomas* only applies to *some* bank fraud. Other types of bank fraud—such as that committed by the defendants in this case—are not subject to *Thomas*'s *mens rea* requirement.

The majority justifies its effort to cabin *Thomas* by arguing that a later decision of this Court, *United States v. Khorozian*, 333

---

[26]*See* 315 F.3d at 195 ("As Thomas admits in her confession, her crime involved a pattern of activity intended to deceive others, including acquiring [her victim's] trust, making deceptive misrepresentations to her, and some to the bank."). Moreover, the goal of her scheme was to obtain money from the bank, even though the money in question belonged to her elderly victim.

F.3d 498 (3d Cir. 2003), created a distinction between those cases that "involved fraud on a third party where the bank was merely an 'unwitting instrumentality' in the fraud" and those in which the bank was itself the "target of deception." According to the majority, only in the former case, where the bank is merely an "unwitting instrumentality," do we require "the additional requirement of proof of an 'inten[t] to cause a bank a loss or potential liability.'" Maj. Op. at 19 (alteration in original). The majority argues that in cases where the bank itself was the "target of deception," "proof of a specific intent to defraud the bank plus fraudulent conduct (e.g., misrepresentations) which creates an actual loss or a risk of loss." Maj. Op. at 18. In such cases, according to the majority, proof of an actual intent to cause the bank a loss or risk of loss is not required.

The argument is flawed for several reasons. First, it fails on its own terms. The jury in this case was never required to find that the conduct of the defendants "exposed the bank to . . . loss." Maj. Op. at 36. Thus, even if the majority's legal standard were correct, the jury instructions were insufficient.

Second, I do not read *Khorozian* in the same way as the majority. In fact, I read *Khorozian* as being entirely faithful to *Thomas*. *Khorozian* simply stands for the proposition that the intent to put the bank at a risk of loss is sufficient to violate the bank fraud statute, even if there was no intent to cause an actual loss. Indeed, we affirmed the jury instructions in *Khorozian* because they "clearly instructed the jurors that they needed to find specific intent to defraud in order to convict." 333 F.3d at 508-09.

70

Thus, nothing in *Khorozian* modified *Thomas*'s core holding that, in order to be convicted of bank fraud, a defendant must act with the intent to defraud the bank.

To be sure, *Khorozian* found *Thomas* and other cases to be "factually distinguishable because [they] involved fraud on a third party where the bank was merely an 'unwitting instrumentality' in the fraud rather than the 'target of deception.'" *See* 333 F.3d at 505. The majority concludes that this statement modified the *mens rea* requirement for bank fraud as set forth in *Thomas*. I disagree. Again, the key issue in *Khorozian* was whether the intent to cause a risk of loss to the bank was sufficient to convict under the bank fraud statute. The above language from *Khorozian* simply stands for the proposition that, in cases in which a bank is that "target of deception," it is perfectly reasonable for a jury to infer the requisite intent absent direct evidence.

It is for this reason that I join the majority's conclusion that the evidence in this case was sufficient to support a conviction. But whether the evidence is sufficient to justify a conviction (which was the issue in the portion of *Khorozian* relied on by the majority) is a very different question from whether the jury instructions communicated the proper legal standard. The answer to the latter question is controlled by our decision in *Thomas*, and I therefore conclude that the District Court's instructions were in error.

Furthermore, the majority's reading of *Khorozian* is clearly foreclosed by *Thomas*. In *Thomas*, we held that a bank can be a "target of deception" and still not be a victim of bank fraud if the

defendant does not act with the requisite *mens rea*.  As we stated in that decision:

> [*United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999)] illustrates the kind of distinction we make between schemes which victimize banks by exposing them to liability or loss, and schemes in which banks, *despite being the target of deception*, are mere "unwitting instrumentalities" to the fraud.[27]

315 F.3d at 201 (emphasis added).  In the same vein, the Court also stated, "Our holding that the statute is to be read conjunctively does not end this matter. We must still decide the thorny question of what is meant by the subsection (1) requirement that the defendant intends to defraud the bank. . . . The Government also suggests that mere "deceptive conduct" toward the bank establishes intent to defraud. We disagree."  315 F.3d at 199-200.

Again, it is clear that the *Thomas* Court saw the bank in that case as a "target of deception," as the defendant deceived the bank

---

[27]It was this language from *Thomas* that *Khorozian* relied on in observing that *Thomas* and other cases were "factually distinguishable because [they] involved fraud on a third party where the bank was merely an 'unwitting instrumentality' in the fraud rather than the 'target of deception.'" 333 F.3d at 505.  This statement from *Khorozian* appears to rests on an erroneous reading of the above language from *Thomas*.  At all events, *Khorozian* did not change the *mens rea* requirement for bank fraud, which was clearly set out in *Thomas*.

72

as to the purpose of the checks she sought to cash.[28]   In fact, *Thomas* held that, unless a bank is the target of the scheme, the defendant cannot be convicted of bank fraud at all.  *See id.* at 198 ("[I]n order to prove bank fraud, a bank must be more than a mere incidental player. A defendant must have deliberately targeted his or her scheme at the banking institution.").  So while the majority today holds that a defendant can be convicted of bank fraud if *either* he targets his scheme at the bank *or* he acts with intent to cause the bank a loss or risk of loss, *Thomas*, on which the majority's analysis purportedly rests, held that the defendant must *both* target his scheme at the bank and intend to cause the bank a loss or risk of loss.[29]

Thus, the majority's statement that *Khorozian* holds that "intent to cause risk of loss" is not required,  Maj. Op. at 20, cannot be correct.  This view is directly contrary to *Thomas*' clear command: the defendant must intend to cause harm or loss to the bank.  *Thomas*, 315 F.3d at 200.  If the majority's reading of *Khorozian* were correct, then that decision would constitute an

---

[28]For this reason, any suggestion that we can simply ignore the problematic language in *Thomas* as dicta is misguided.

[29]That *Thomas* held that merely causing a loss or risk of loss is not sufficient is made clear near the end of the opinion:

> Moreover, even were there a colorable case for civil liability set forth here, it must also be shown that Thomas intended to victimize the bank.  Even a scheme which does expose a bank to a loss must be so intended.

315 F.3d at 202.

impermissible attempt to overrule *Thomas*, and, under Third Circuit Internal Operating Procedure 9.1, *Thomas* would remain the law of this Circuit. *See O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 354 (3d Cir. 1981) (holding that, to the extent a later decision conflicts with an earlier decision, the later decision "must be deemed without effect.").[30] Thus, if the majority is correct and *Khorozian* conflicts with *Thomas*, then *Thomas*, not *Khorozian*, would prevail. Either way, the jury must find intent to cause the bank a loss or risk of loss.

The majority's reliance on *United States v. Moran*, 312 F.3d 480, 489 (1st Cir. 2002), *see* Maj. Op. at 17, is also misplaced. No matter what a different Circuit has held, the *Khorozian* panel was bound by our prior decision in *Thomas*.[31]

---

[30]Indeed, in questioning our assertion that *Khorozian* can be read as being faithful to *Thomas*, Maj. Op. at 20, the majority comes close to suggesting that *Khorozian* did overrule *Thomas*.

[31]The majority goes so far as to claim that "it is well-established that the 'intent to defraud the bank' element of § 1344 may be defined as 'an intent to deceive the bank in order to obtain from it money or other property.'" Maj. Op. at 15 n.8. In support of this supposedly "well-established" principle, the majority does not cite a single case that is controlling in this Circuit. *See id.* (citing *United States v. Moran*, 312 F.3d 480, 489 (1st Cir. 2002); *United States v. Brandon*, 298 F.3d 307, 311 (4th Cir. 2002); *United States v. Lamarre*, 248 F.3d 642, 649 (7th Cir. 2001); *United States v. Hanson*, 161 F.3d 896, 900 (5th Cir. 1998). What *is* "well-established" in this Circuit is our decision in *Thomas*, which held that "a defendant must intend to cause a bank a loss or potential liability, whether by way of 'statutory law, common law, or business practice.'" 515 F.3d at 201 (citation omitted). Given the unusual nature of our holding in *Thomas*—that a facially disjunctive statute is to be read in the conjunctive—it is not

74

Moreover, in *Moran*, the First Circuit stated that the defendant acted "with a clear motive to secure a financial windfall at the bank's potential expense." *Id*. at 491. Thus, *Moran* does not hold, as the majority suggests, that a defendant need only intend to make misrepresentations to the bank. *See* Maj. Op. at 17 (citing *Khorozian*, 333 F.3d at 505). The defendant in *Moran* did more than make misrepresentations to the bank: he acted with the intent to harm the bank by exposing it to a risk of loss.

## C.

Finally, this error was not harmless. *See Gov't of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976) (holding error harmless if "it is highly probable that the error did not contribute to the judgment"). On the record, I cannot find that high probability. I acknowledge that in *Neder v. United States*, 527 U.S. 1, 18 (1999), the Supreme Court found it was harmless error for the jury instructions to have omitted an element of the criminal offense where the "omitted element is supported by uncontroverted evidence." That is not this case here. Indeed, at several points the government argued to the jury that the real victims of the defendants' actions were the banks' customers.

For these reasons, albeit reluctantly, I would set aside the

surprising that other courts would disagree. But the fact of their disagreement does not render *Thomas* any less valid. And none of the cases cited by the majority was decided by a court that reads § 1344 in the disjunctive. *See United States v. Kenrick*, 221 F.3d 19, 30 (1st Cir. 2000) (reading § 1344 in the disjunctive); *United States v. Moede*, 48 F.3d 238, 241 n.4 (7th Cir. 1995) (same); *Brandon*, 298 F.3d at 311 (same); *Hanson*, 161 F.3d at 900 (same).

convictions and remand for a new trial.

## II.

The majority rightly acknowledges the dangers inherent in using the standard of "moral uprightness and fairness" to define fraud in a jury instruction. While noting the concerns trenchantly expressed in *United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002), the majority nevertheless upholds the charge in this case because "the instructions, taken as a whole, properly instructed the jury as to the proof required to establish a 'scheme to defraud' as well as the appropriate intent to defraud. . . . The jury could not have convicted the defendants merely for failing to adhere to standards of moral uprightness or fundamental honesty." Maj. Op. at 25.

In my view, the standard of "moral uprightness" has no place in jury instructions defining fraud, as it broadens the federal fraud statute in a manner that "give[s] inadequate notice of criminality and delegate[s] to the judiciary impermissibly broad authority to delineate the contours of criminal liability." *Panarella*, 277 F.3d at 698. Moreover, I am unpersuaded by the fact that *Khorozian*, 333 F.3d at 508-09, upheld an instruction which defined fraud as "a departure from basic honesty, fair play, and candid dealings." *Khorozian* approved of this instruction after viewing the charge as a whole and determining that the instructions were clear that specific intent to defraud must be found to convict.

In affirming the District Court's reference to moral

76

uprightness, the majority cites to *United States v. Dobson*, 419 F.3d 231 (3d Cir. 2005). *See* Maj. Op. at 26. In *Dobson*, a mail fraud case, the District Court instructed the jury that a scheme to defraud under 18 U.S.C. § 1341 is defined as "a departure from fundamental honesty, moral uprightedness, or fair play and candid dealings in the general light of the community." *Id at 239.* We reversed the defendant's conviction, finding that the instructions, taken as a whole, were inadequate. We stated in passing that the reference to moral uprightness was not itself objectionable, but this brief mention of moral uprightness provides virtually no support for the majority's position because (1) the statement was pure dicta; (2) the panel was applying plain error analysis; (3) the issue was not briefed by the litigants; and (4) the panel mentioned the issue in a passing reference, without any discussion or analysis.

I disagree that the jury instructions were so innocuous in this case. We, of course, do not look to portions of the instructions in isolation, and must consider them in their totality. *See United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995). In my view, however, the notion of "moral uprightness"—missing from the instructions used in *Khorozian*—was central to the definition of fraud in the jury instructions in this case, and thus I fail to see how the remainder of the instructions cures this problem, or how it could be considered harmless error under the applicable high probability standard.[32]

---

[32]I agree with the majority that the willful blindness instruction was not erroneous as to Leahy, and that, while in error, the instruction was harmless as to Smith. *See* Maj. Op. at 30-31 n.15. My only concern with the majority's discussion of this point

is that the majority concludes that the instruction—which permitted the jury to infer that the element of knowledge could be inferred based on proof that "a *defendant* deliberately closed his eyes"—was justified primarily by the behavior of an individual who was not a defendant. The majority approves of the charge because there was evidence that Dominic Conicelli, Sr., the sole shareholder and president of Dantone, Inc., was willfully blind to the conduct of his employees. Conicelli's knowledge was certainly relevant to the question whether Dantone's employees committed bank fraud "within the scope of their employment" such that the corporation could also be convicted. But the jury instruction referred specifically to a "*defendant*'s knowledge of a fact." The jury could reasonably have assumed that the instruction was only intended to apply to the individual defendants. Thus, to the extent it was justified based on Conicelli's conduct, the willful blindness instruction was unnecessarily vague. Nevertheless, I conclude that any error resulting from the instruction was harmless. *See* Maj. Op. at 30-31 n.15.

78